

## POLICE DEPARTMENT CITY OF NEW YORK

December 9, 2016

MEMORANDUM FOR:    Police Commissioner

            Re:    Police Officer Ricardo Dolcine
                  Tax Registry No. ▮▮▮▮▮▮▮▮▮
                  Housing PSA 9
                  Disciplinary Case No. 2016-15359
                  -------------------------------------------

**Charges and Specifications:**

1.     Said Police Officer Ricardo Dolcine, while assigned to the 43rd Precinct, on or about March 4, 2016, while off-duty, in the confines of the 32nd Precinct, was discourteous to on-duty Members of Service in that said Officer was belligerent and yelled expletives at the on-duty Members of Service.

            P.G. 203-09, Page 1, Paragraph 2 - PUBLIC CONTACT – GENERAL

2.     Said Police Officer Ricardo Dolcine, while assigned to the 43rd Precinct, on or about March 4, 2016, while off-duty, in the confines of the 32nd Precinct, did fail and neglect to comply with the direction of on-duty Members of Service relating to a traffic stop.

            P.G. 203-10, Page 1, Paragraph 5 – PUBLIC CONTACT – PROHIBITED CONDUCT

**Appearances:**

For the Department:    Beth Douglas, Esq.
                      Department Advocate's Office
                      One Police Plaza
                      New York, NY  10038

For Respondent:    Roger S. Blank, Esq.
                      373 Park Avenue South – 6th floor
                      New York, NY  10016

**Hearing Dates:**
October 17 and November 4, 2016

**Decision:**
Specification 1: Guilty
Specification 2: Not Guilty

**Trial Commissioner:**
ADCT Jeff S. Adler

## REPORT AND RECOMMENDATION

The above-named member of the Department appeared before me on October 17 and November 4, 2016.  Respondent, through his counsel, entered a plea of Not Guilty to the subject charges.  The Department called Police Officer Kerin Donahue, Sergeant Tomeka Ruffin, and Police Officer Richard Hanson as witnesses.  The Department also introduced video footage showing the car stop.  Respondent called Police Officer Christopher Derenze as a witness, and Respondent testified on his own behalf.  A stenographic transcript of the trial record has been prepared and is available for the Police Commissioner's review.

## DECISION

After reviewing the evidence presented at the hearing, and assessing the credibility of the witnesses, I find Respondent guilty of Specification 1, and not guilty of Specification 2.

## FINDINGS AND ANALYSIS

At about 0810 hours on March 4, 2016, Officers Kerin Donahue and Richard Hanson were in a marked RMP monitoring the intersection of 139th Street and Lenox Avenue in Manhattan.  At that intersection is a sign prohibiting left turns from Lenox Avenue onto 139th Street during certain hours, 7-10 AM and 4-7 PM.  A photograph showing that sign was admitted into evidence (Dept. Ex. 1).

From their vehicle, the officers observed Respondent, who was off-duty at the time, make the left turn onto 139th Street in his SUV. The officers pulled over Respondent's SUV part way up the block on 139th Street. Video footage from a building's surveillance camera across the street shows the car stop from a distance (Dept. Ex. 2).

The officers approached the SUV and engaged Respondent in conversation. At some point during that discussion, the officers became aware that they previously had pulled over Respondent for allegedly driving with excessively tinted windows. After a brief discussion, the officers returned to their RMP to await the arrival of a supervisor. While they were waiting, Respondent emerged from his SUV and approached the RMP, and there was additional discussion. At issue is whether Respondent was discourteous to the officers during their interaction, and whether Respondent disobeyed directions by the officers to return to his vehicle until a supervisor arrived on the scene.

Officer Kerin Donahue testified that after pulling over the SUV, she approached on the passenger's side while her partner approached on the driver's side. Respondent was sitting in the driver's seat with his Department ID sitting in his lap. Officer Hanson asked Respondent for his license and registration, and the two of them engaged in a conversation in "raised tones." Respondent was "very angry" and "very combative" as he complained of harassment, saying that there was no reason for him to be pulled over. He insisted that there was no such sign at the location, and expressed his intention to go back to the intersection afterward to check it out independently. He also stated that the officers should know who he was, since they had pulled him over on a prior occasion. (Tr. 21-22, 54, 57)

It was at this point that Officer Donahue recognized Respondent from that prior car stop. Her recollection was that one or two months prior, she and her partner had stopped Respondent for having windows with excessive tint. During that previous stop, Respondent had initially refused to lower his rear windows all the way so the officers could see inside for their mutual safety. Respondent partially lowered the rear windows, and explained that his children were in the back seat and were sick, so he didn't want to roll the windows all the way down in the cold. Respondent had his police identification, and as a courtesy the officers let him go without a ticket. When asked whether Officer Hanson called Respondent a "fucking asshole" as they were walking away, she answered, "I don't recall." (Tr. 22, 46, 72, 74) Officer Donahue acknowledged that she didn't have any specialized training in testing for tint levels, and at the time of that prior stop she and her partner did not have a tint meter with them. (Tr. 44)

Officer Donahue testified that after bringing up the previous car stop, Respondent continued to speak to Officer Hanson with "elevated tones" in a very combative manner. In order to try to calm the situation, and out of concern for the safety of her partner, Officer Donahue walked around to the driver's side to speak with Respondent as well. Respondent insisted that they either issue him a ticket or call a supervisor. The officers told him that they would summon a supervisor, and Officer Donahue asked for Respondent's Department ID card to give to the supervisor. Respondent voluntarily complied, and the officers returned to their RMP. (Tr. 26-28, 60-61)

According to Officer Donahue, while they were waiting, Respondent emerged from his SUV and approached the RMP. The officers exited their vehicle as well, and instructed Respondent numerous times to return to his car. At first, Respondent did not

comply; he had his wallet in his hand and asked if he could give the officers another form
of identification in exchange for the return of his police ID. As he approached, he told
them that they would regret this, that they didn't know who he was. Respondent
retrieved some items from his wallet that had fallen to the ground, and returned to his
SUV until the supervisor, Sergeant Ruffin, arrived. (Tr. 29-31, 40, 63-65, 68)

Officer Richard Hanson testified that before he and his partner reached the SUV,
all the windows were lowered, a "de-escalation move." Officer Hanson approached on
the driver's side and asked Respondent for his license, registration, and insurance. Rather
than provide them, Respondent became very irate, "yelling at the top of his lungs" that
there was no basis for the stop. When Officer Hanson explained that he had made an
improper left turn, Respondent insisted there was no such sign. Respondent also yelled
that the officers should know who he was, since they had pulled him over two months
prior. After about two-to-three minutes, Respondent produced his police shield from his
right jacket pocket and placed it on his lap, the first time he identified himself as a
member of the service. (Tr. 109, 112-113, 146-147, 150-151, 155)

According to Officer Hanson, his partner came around to join him on the driver's
side. Respondent asked that they either issue him a summons or call a supervisor to the
scene. Respondent handed his NYPD identification to Officer Donahue, and the two
officers returned to their RMP where they called for Sergeant Ruffin. While they were
waiting, Respondent exited his vehicle and approached the RMP, yelling that they'll be
"f'ing sorry for the stop." As Respondent was asking for his police ID back he dropped
his wallet, and some items from the wallet fell out to the ground. Officer Hanson
testified that he told Respondent "at least on two occasions" to get back in his vehicle,

but Respondent continued walking toward the RMP. Once Respondent was able to pick up the items that had fallen from his wallet, he returned to his SUV without further incident. (Tr. 113-114, 116-118, 129, 157, 165-166, 171)

Regarding the prior car stop, Officer Hanson testified that he did have prior training in tinted windows (though he did not receive a certificate), and he had his own tint meter with him that day. Because of the tint on Respondent's vehicle, he was unable to see inside the rear of the car. The front driver's side window was rolled down, and Officer Hanson asked Respondent to lower the rear windows, which were all the way up. Respondent initially refused, saying he had children who were ill in the back. Officer Hanson again instructed him to roll down the windows, and if there were children in the back he could roll them right back up. At this point, Respondent did roll down the rear windows about an inch or two, and identified himself as a member of the service. According to Officer Hanson, Respondent spoke to the officers as if he were "entitled," based on his having more time on the job than they did. Nevertheless, as a courtesy the officers allowed Respondent to leave without issuing him a ticket. Officer Hanson denied calling Respondent a "fucking asshole" as he was walking away. (Tr. 120-121, 126-129, 131, 139, 142-143)

Sergeant Tomeka Ruffin testified that she responded to the scene of the March 4 car stop and spoke briefly with the officers. The officers had indicated that Respondent was "yelling at them and pretty much causing a scene." Officer Donahue gave her Respondent's ID card. The sergeant instructed all the parties to meet back at the 32nd Precinct. Respondent was cooperative and followed her directives. (Tr. 82, 84, 87)

Police Officer Christopher Derenze, a union delegate on the date of the incident, testified that he spoke with Officers Hanson and Donahue at the 32nd Precinct, and spoke with Respondent as well. He maintained that he did not speak with investigators regarding what he had been told in those conversations, though it was stipulated that the questioning by investigators in their Department interviews of the officers and Respondent was very fact-specific. (Tr. 182-183, 188)

Respondent testified that as soon as the officers pulled him over on March 4, he lowered all the windows of his Range Rover and placed his hands on the steering wheel to demonstrate his cooperation. Officer Hanson asked for his license and registration, but rather than provide them Respondent asked why he was being pulled over. Officer Hanson said that after Respondent produced his license and registration, the officer would then tell him the reason for the stop. Respondent asked for permission to reach into his pocket, and removed his shield holder which contained his various forms of identification, and placed it on his lap. According to Respondent, Officer Hanson saw the shield and stated, "So you're a cop." Respondent confirmed that he was an officer, and reminded Officer Hanson that he should know that since he had pulled over Respondent recently. (Tr. 231-235, 271)

According to Respondent, Officer Hanson then asked whether he was accusing the officer of targeting Respondent for harassment. Respondent answered no, but stated that he wasn't aware of the sign prohibiting a left turn; he apologized if there was such a sign, but said that he would check for himself when they were done there. Officer Hanson questioned why Respondent would need to check for the sign, and added, "It's not going to be like the last time. This time you're going to listen to me." Respondent

denied that he was screaming, claiming that it was Officer Hanson who was agitated and
yelling at him like he was "screaming at a perp." (Tr. 236-239, 269)

Officer Donahue, meanwhile, had walked over to the driver's side as well.  She
asked for his police identification, which he provided, since he had errands to run for his
wife and "wanted to get on with it."  When Officer Hanson continued to yell at him,
Respondent said they should feel free to just issue him a summons.  Officer Donahue
suggested they might instead call a sergeant, and Respondent said they should do
whatever they wanted.  Respondent testified that the officers returned to their RMP
without indicating what they were intending to do. (Tr. 240-243)

A few minutes later Respondent exited his vehicle and approached the RMP,
intending to give the officers his license and registration, which he figured they would
need if they were writing him a summons.  He offered to exchange the license and
registration for his police identification, but Officer Donahue told him no, they were
waiting on the sergeant instead.  At the same time Respondent was speaking with Officer
Donahue, Officer Hanson was simultaneously telling Respondent to return to his car.
Some of Respondent's identification items fell to the ground; he picked them up and
returned to his vehicle.  Respondent denied that he cursed at or threatened the officers.
(Tr. 244-247, 250, 283-285)  At the 32nd Precinct, Respondent gave a detailed account
only to Officer Derenze, the delegate, before Respondent's Department interview. (Tr.
255, 262)

Respondent also testified regarding the prior car stop, which he said occurred
between two weeks and a month earlier.  His two boys, ages five and seven, were in the
rear seat of the same SUV.  Respondent lowered his front windows all the way, but only

lowered the rear window "maybe a little over half." When Officer Hanson asked him to lower the rear window all the way, Respondent explained that it was cold outside and one of his kids was sick. Officer Hanson said he didn't care, and again instructed Respondent to lower the windows all the way, to which Respondent complied. (Tr. 208-212, 216-217, 277) Respondent offered into evidence several photographs showing how far down the window initially was lowered, and illustrating how much of the interior could be seen (Resp. Ex. A-C).

After lowering the windows, Respondent apologized and informed the officers that he, too, was a member of service. Officer Hanson shouted at him that as a cop he should know what it's like to do a car stop. Respondent became defensive and questioned their tactics, and after some more back-and-forth, the officers walked away. Respondent testified that as they were leaving, Officer Hanson said to Respondent, "You're a fucking asshole," which Respondent's older son heard. (Tr. 218-219, 221)

The video footage (Dept. Ex. 2) shows the car stop from a distance, so it is difficult to see the precise details of the interaction between Respondent and the uniformed officers, and there is no audio on the recording. The video is divided into two consecutive sections. In the first, the officers can be seen pulling over Respondent and approaching his SUV. Their conversation with Respondent begins at approximately the 0:48 mark, Officer Donahue joins her partner on the driver's side at about 2:31, and at 3:56 the officers return to their RMP. In the second part of the video, Respondent emerges from his vehicle at the 0:11 mark and approaches the RMP. By 1:12, Respondent moves to pick up his items from the ground and returns to his SUV. The

next minute-and-a-half passes without incident, and then the sergeant arrives in another

RMP. All of the vehicles drive off about a minute later.

Each side argues that an evaluation of what occurred during the March 4 car stop

should begin with an assessment of the initial stop for the tinted windows. The

Department argues that just as he was uncooperative during the first stop, Respondent

was similarly belligerent during the stop for the improper left turn. Respondent, in

contrast, suggests that it was Officer Hanson who was unreasonable during the initial

stop, and that the officers continued their harassment of Respondent with the second car

stop for the left turn. There are no charges based on what occurred during the initial stop,

and this tribunal needs not resolve which of the participants was in the wrong on that

occasion. Evidence of that prior encounter was only considered as background

information for the events of March 4, which is the subject matter of this case.

Specification 1 alleges that Respondent was discourteous to the officers in that he

was belligerent and yelled expletives at them. Respondent claimed that it was Officer

Hanson who was agitated and yelling during their interaction, though Respondent,

himself, acknowledged that he did not initially provide his license and registration when

asked. Officers Donahue and Hanson, meanwhile, testified that it was Respondent who

was loud and angry when they pulled him over. Specifically, Officer Hanson described

Respondent as "irate" during their conversation, "yelling at the top of his lungs" that

there was no basis for the stop. Officer Donahue confirmed that an angry Respondent

spoke to Officer Hanson with a raised voice and was being "very combative" with her

partner.

In seeking to resolve the conflicting accounts provided by Officer Hanson and Respondent, this tribunal looks to the testimony of Officer Donahue. On the one hand, counsel was correct in noting that Officer Donahue was Officer Hanson's partner at the time, and as such, potentially biased in his favor. Nevertheless, Officer Donahue came across as objective and professional in her testimony, which essentially corroborated the account of Officer Hanson regarding how Respondent was speaking in a combative manner. Indeed, it reached a point where in response to Respondent's behavior, Officer Donahue walked around to the driver's side because she was "concerned for the safety" of Officer Hanson. This was not a case of harassment or retaliation on the part of the uniformed officers. Rather, the credible evidence has established that this encounter began with a legitimate traffic stop. Respondent did not produce his license and registration when asked, failed to immediately inform the officers that he was a member of service, and argued in a loud voice with the officers about their basis for pulling him over. Because of Respondent's conduct, what should have been a routine car stop needlessly escalated into a hostile confrontation between Respondent and the two officers. Accordingly, I find Respondent guilty of Specification 1.

Specification 2 alleges that Respondent failed to comply with the officers' directions to return to his vehicle. Officer Hanson testified that he told Respondent "at least on two occasions" to return to his car, and Officer Donahue stated that they gave the instruction "at least more than three times, if not more." Respondent, though, explained that he approached the RMP with the intention of providing his driver's license, since he believed the officers were planning to issue him a summons and wanted to facilitate the process. While he was addressing Officer Donahue about exchanging his license for his

police identification, Officer Hanson was telling him to return to his vehicle.  Respondent

paused to retrieve some of his identification items, which had fallen to the ground, and

then returned to his car to await the arrival of the sergeant.

On balance, this tribunal is not persuaded that Respondent's actions here

constituted misconduct.  I credit Respondent's description of how two conversations were

occurring simultaneously, and I agree with counsel's argument that under these

circumstances Respondent was not disobeying a directive from the uniformed officers.

Also, it is undisputed that during part of this time, some items fell from Respondent's

wallet, which he bent down to retrieve, delaying his return to his SUV.

To be sure, Respondent, who was off-duty at the time, had an obligation to obey

the directions of the uniformed officers who were handling the situation.  However, from

the video footage it appears that only about a minute passed from the point Respondent

emerged from his vehicle until he began walking back to the SUV.  This portion from

page 65 of Officer Donahue's testimony sums up the brevity of this part of the incident:

Q.     So you direct him back to his car, he drops his cards, picks them up, puts

        them in his wallet and goes back to his car?

A.     Yes.

Under the circumstances, the record has not established by a preponderance of the

credible evidence that Respondent failed to comply with the directions of Officers

Hanson and Donahue to return to his vehicle.  Respondent's behavior did not rise to the

level of misconduct, and I find Respondent not guilty of Specification 2.

## PENALTY RECOMMENDATION

In order to determine an appropriate penalty, Respondent's service record was examined. See *Matter of Pell v. Board of Education*, 34 NY 2d 222 (1974). Respondent was appointed to the Department on July 6, 2010. Information from his personnel record that was considered in making this penalty recommendation is contained in an attached confidential memorandum. Respondent has no formal disciplinary history.

Respondent has been found guilty of one of the two specifications, for his belligerent behavior toward the uniformed officers who pulled him over for a traffic violation. Because of Respondent's actions, what should have been a routine car stop needlessly escalated into a hostile confrontation. There must be some accountability for the manner in which Respondent, himself a member of service, interacted with the uniformed officers who stopped him.

The Department recommends that Respondent forfeit eleven (11) days already served on pre-trial suspension. Notwithstanding the "not guilty" finding on Specification 2, that penalty recommendation is reasonable for what occurred here. Taking into account the totality of the issues and circumstances in this matter, including Respondent's lack of formal disciplinary history and his strong military background, I recommend that Respondent forfeit the eleven (11) days already served on pre-trial suspension.

Respectfully submitted,

**APPROVED**

MAR 20 2017

JAMES P. O'NEILL
POLICE COMMISSIONER

Jeff S. Adler
Assistant Deputy Commissioner Trials